**Edgar B. SNYDER, Plaintiff,**

v.

**The BOEING COMPANY, Defendant.**

**No. 00–1270–JTM.**

United States District Court,
D. Kansas.

Sept. 6, 2001.

John L. Brennan, Brennan & Keil, Edgar B. Snyder, Wichita, KS, for Plaintiff.

Mikel L. Stout, Trisha A. Thelen, William M. Anderson, Foulston & Siefkin L.L.P., Wichita, KS, for Defendant.

## MEMORANDUM ORDER

MARTEN, District Judge.

In the present action, plaintiff Edgar B. Snyder has brought claims of disability and age discrimination against his former employer, Boeing. Boeing has moved for summary judgment. For the reasons stated herein, the court finds that summary judgment is appropriate.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpret-

ed in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## 1. Findings of Fact

Edgar B. Snyder first began working for Boeing in 1960. On several occasions, he left Boeing to pursue other jobs. In 1990, plaintiff was doing contract work for another company when he re-applied at Boeing. Boeing rehired plaintiff on September 6, 1990, and paid to move his family from Lake Havasu City, Arizona, to Wichita. Snyder remained employed at Boeing until he was medically laid off on August 20, 1998.

When Snyder was rehired on September 6, 1990, he was a grade 6 Jig Builder C (701–06). He was promoted to a grade 10 Tool and Die Maker position on January 21, 1991. The Tool and Die Maker job is a difficult job that consists of fabricating and reworking tools and dies. The job involves the use of equipment such as drill presses, conventional mills, jig grinders, floor mounted grinders, bandsaws, lathes, surface grinders, Dotcos and electrical discharge machines. The job requires an employee to use his hands on a frequent to constant basis (2/3 of a shift to a full shift), and also involves pushing and pulling up to five or more hours per day.

Snyder suffered an on-the-job injury, the first relevant herein, on July 26, 1994. According to plaintiff, he was trying to get away from skunks in the Boeing parking lot when he tripped over a parking median, fell and injured himself. As a result of the fall, Snyder began having physical therapy treatments and eventually went to Dr. Lesko. Snyder testified that Dr. Lesko originally thought he needed surgery on his shoulder. However, Dr. Lesko was not certain that plaintiff would heal properly. As a result, he recommended that Snyder continue the physical therapy treatments

he had been receiving. In December 1994, Dr. Lesko released Snyder to return to work with a three-hour grasp and grab limitation.

Prior to the first injury, Snyder performed the standard duties of a Tool and Die Maker. As a result of his injury, however, Snyder's supervisors re-assigned him to different duties. While he was still classified as a Tool and Die Maker, he was not performing the standard writeup of that position. Instead, Snyder was performing what he characterizes as a troubleshooter position on second shift. His supervisor characterizes it as "makework." In other words, Snyder was not performing the standard job write-up, but instead his supervisors were finding work for him.

Snyder suffered a second injury on August 22, 1997, when he stepped in a rut and hurt his knee. As a result of that injury, Dr. Duane Murphy performed surgery on Snyder in January 1998. After the surgery, Snyder had trouble walking, even using crutches. Because of his walking problems, two of the restrictions Dr. Murphy gave Snyder were for close parking and to avoid prolonged walking. Dr. Murphy did not define either of these terms when he first gave the restrictions to Snyder. However, in April 1998, Snyder filled out a request for permanent medical parking which placed restrictions on Snyder's walking.

In his response, Snyder argues that Dr. Murphy was only completing the form so that Snyder could obtain close parking, and was not otherwise imposing or suggesting any limitation. However, the form clearly suggests that Dr. Murphy's medical opinion is that Snyder should be subject to restrictions on his movements. In the part of the form to be completed by the employee's personal care provider, the form asks for a "diagnosis," and requests

that the providers state any "necessary restrictions ... for walking and/or stairs." (Def.Exh. 5). Dr. Murphy wrote that Snyder could only walk 35 yards at a time, and 200 yards total for each full 8–hour work shift. This restriction became permanent on April 22, 1998.

Although Snyder had subsequent visits with Dr. Murphy, Dr. Murphy did not change Snyder's restrictions while Snyder was employed at Boeing. Nor did Snyder ask him to do so. Once a restriction becomes permanent, the only person who can lessen it is the employee's doctor. Snyder knew this, but never asked Dr. Murphy to reduce his restrictions.

In November 1997, Snyder's shop on second shift was closed. As a result, all Tool and Die Makers were transferred to first shift. On first shift, Snyder was going to have to perform the standard write-up of a Tool and Die Maker. Snyder admits that Boeing believed the job was outside of Snyder's restrictions. In fact, Boeing did an ergonomic evaluation of the position and determined that the job was inconsistent with his restrictions and he could not be accommodated. As a result, Boeing needed to find another position for Snyder if Snyder was to remain employed at Boeing.

When an employee's job is outside of his permanent restrictions, Boeing begins the Accommodation Review Board process. The first step in the ARB process is attempting to find an accommodation to allow the employee to perform his job. If one is not found, Ergonomics becomes involved. Ergonomics evaluates the employee's job to verify that it is outside of the employee's restrictions and also to attempt to identify potential accommodations. As a part of this process, Ergonomics meets with the employee to get his input into possible accommodations. Ergonomics interviews the employee and fills out Form Al, which details the conversation. If no accommodation is possible in the employee's current job, Boeing, through I.A.M. Crest, searches for another job the employee can perform. While meeting with the employee, Ergonomics also asks for the employee's input about other jobs he believes he can perform.

The ARB process involves the input of many people including the employee, management, personnel representatives, Ergonomics, Boeing Medical, and I.A.M. Crest. If accommodations have not been identified or a placement has not been found, the employee's case is presented to the ARB, which may suggest other accommodations, a placement, or may determine that medical layoff is the proper course of action. During the relevant period of time, the members of the ARB were Richard Rader (Personnel), Richard Clark (Equal Employment Opportunity), Richard Buchanan (Operations), and Dr. Jenkins (Medical). The final decision is made by the ARB. If the Board agrees that everything has been done and no accommodation is possible, the employee is medically laid off.

Boeing records indicate that Snyder met with Monique Lanciault, a Boeing Ergonomist, in December 1997 to discuss what jobs he could perform. While Snyder does not recall this meeting, he admits it could have occurred. Snyder further admits he signed Employee Input Form Al. That form indicates that Snyder was complaining that his shoulder injury was affecting his ability to perform the Tool and Die Maker job. It also shows that Snyder could not think of any accommodations which would allow him to perform his job, nor did he know of any other jobs he could perform.

Despite Snyder's lack of input, Boeing Ergonomics, I.A.M. Crest, Snyder's management and Snyder's personnel representatives believed he could perform within

his restrictions as a grade 5 Factory Consumables Handler A (607–05), also known as a "Tool Crib" job. Snyder transferred to the Tool Crib job on February 26, 1998. Although this was a lower graded job, Snyder kept his grade 10 pay because it was a medical placement. Snyder signed an acknowledgment form on February 26, 1998, stating that he was being transferred to the Tool Crib job for medical reasons.

Snyder started in the Tool Crib on February 26, 1998. He spent approximately three weeks training for the position. At that point, he was assigned to Tool Crib 81 in the Assembly Support Building ("ASB"). While this was to be his permanent position, Snyder remained there for approximately a month and a half (this was shortly after he applied for and received his permanent medical parking sticker and his permanent walking restriction). Because Snyder was walking too far in ASB, Boeing transferred him to a Tool Crib in IPB4. While there had been no available medical parking in ASB, Snyder was able to park within 35 to 40 yards of his Tool Crib in IPB4. Furthermore, the Tool Crib in IPB4 was the smallest Tool Crib at Boeing and Boeing felt that Snyder would be able to stay within his restrictions there.

Snyder was working in IPB4 in July 1998. His supervisor at the time was Mark Eldridge. Eldridge was Snyder's supervisor from approximately May 1998 through Snyder's lay off. On July 8, 1998, Snyder called Eldridge to complain that he was not getting overtime. Snyder does not recall everything from the conversation. However, Boeing and I.A.M. Crest records indicate that Snyder was told he could not work overtime because working overtime required an employee to work at several different Tool Cribs. In the Tool Cribs, overtime was on the weekends when there were fewer Tool Crib Attendants on duty. As a result, the employees were required to staff several tool cribs. This required the employee to walk back and forth between the Tool Cribs and would have involved more walking than allowed by Snyder's restrictions. Boeing and I.A.M. Crest records also indicate that Snyder responded he was already walking more during the week than allowed by his restrictions so he should be allowed to work overtime on the weekends.

Boeing looked into Snyder's allegations and found that the Tool Crib job indeed was outside of his medical restrictions, including his 3–hour grasp/grab limitation and his 200–yard per shift walking limitation. In fact, while Snyder's walking restriction was 200 yards per shift, Snyder testified he was walking at least 1700 yards per shift. As a result, Boeing tried to find accommodations that would allow Snyder to perform the job within his restrictions. However, they were not able to find any. Therefore, they held a meeting with Snyder on July 14, 1998, in which they informed him they were not able to accommodate his medical restrictions in the Tool Crib job and he was being sent home. Thereafter, he was informed that they began the ARB process again.

Snyder is not sure whether anyone was trying to find a job for him that he could perform within his restrictions. However, Steve Benjamin, an I.A.M. Crest employee, was doing just that. Benjamin sent several e-mails to personnel representatives throughout the Boeing plant to find out if there were any openings that Snyder could perform within his limitations. He also reviewed at least four jobs and determined that Snyder could not perform them within his restrictions. He did believe that Snyder could perform an assembler position. Benjamin called Snyder on July 22, 1998, and offered him that position. Snyder told Benjamin he had already per-

formed that job and did not wish to go back to it.

Snyder remembers talking to a "young man from Ergonomics," but does not recall specifically talking with Benjamin. Snyder testified in his deposition that he does not recall some of the events surrounding this litigation, but he admits they could have occurred. Snyder testified he has trouble sometimes remembering what happened three weeks ago.

Sondra Mitchell called Snyder on July 28, 1998, to complete the Employee Input Form Al. Snyder also does not recall this phone call. However, Mitchell's records show that Snyder told her he was having problems with his legs and that this was affecting his ability to perform his job. Snyder did not know of any accommodations that would allow him to perform his job, nor did he know of any other jobs he could perform.

Snyder's case was presented to the ARB on August 20, 1998. After reviewing the relevant records, the ARB decided Snyder should be medically laid off.

In support of his age discrimination claim, Snyder alleges that, in November 1997, co-workers were calling him names such as "Fast Eddy," "Old Man," and "Sue Happy." Snyder did not personally hear most of these comments, because the employees who allegedly said these things were on first shift. Instead, the comments were relayed to him by a co-worker, Johnny Nugent. Nevertheless, Snyder felt these comments were discriminatory and informed his second level supervisor, Dennis Malone, about them when he received an award for attendance in September 1997. He does not know what Malone did as a result of this complaint. (Snyder dep. at 108–09, 113–14, 117–18).

Snyder also met with Malone in November 1997. Snyder alleges that at this meeting he told Malone the comments about him were continuing. Malone told Snyder he would take care of it. Snyder believes Malone then called one of the first shift supervisors and told him to hold meetings to inform the crew that any such name-calling was against company policy. Snyder admits he doesn't know whether this was successful in eliminating the comments because he was on second shift and did not attend the meeting, which was held on first shift. Thereafter, Snyder stayed out of contact with the first shift employees who were making the comments.

Snyder had another meeting with Malone in either December 1997 or January 1998. According to Snyder, he told Malone he believed the comments were still being made. However, Snyder admits he has no personal knowledge of whether the comments stopped after the November meetings that were held at Malone's direction. Snyder did not have any subsequent meetings with Malone.

As a result of Snyder's complaints, Brenda Coleman performed an investigation. She found that some comments were being made prior to the crew meeting held at Malone's direction. Coleman further found that, after Snyder complained, management took the appropriate action and the comments ceased. Furthermore, Snyder did not subsequently complain. As indicated earlier, Snyder subsequently transferred to the Tool Crib job on February 26, 1998, and no longer worked with the people who he claimed made the inappropriate comments.

Snyder does not know who was responsible for his transfer. He admits he has no evidence that the co-workers about whom he complained either had the authority to get him transferred or actually got him transferred. In fact, the transfer was worked out between members of plaintiff's management, plaintiff's personnel representatives, Boeing Ergonomics and I.A.M. Crest. Hourly workers, such

as the individuals about whom Snyder complained, do not have the authority to transfer other employees.

Snyder told Mike McVay he didn't think it was right that he was being transferred to the Tool Crib position. However, he testified that he did not say he was unhappy with the move. In fact, Snyder testified that he later told Brenda Coleman he liked the Tool Crib job.

Snyder admits he felt the comments were discriminatory in November 1997 when they occurred. He also admits none of his supervisors in Tool Cribs or any member of the ARB discriminated against him because of his age. In fact, the only members of management that Snyder feels discriminated against him because of his age were Dennis Malone and Mike McVay. However, Snyder admits he does not know of anything that McVay did or said that was discriminatory other than allowing him to be transferred to the Tool Crib job. Snyder believes Malone retaliated against him by allowing him to be transferred to the Tool Crib, but admits that other than his feeling that this was retaliation he has no facts to support his claim.

In the Pretrial Order, Snyder alleges he was medically laid off in violation of the ADA. He claims Boeing misconstrued or inflated Dr. Murphy's restrictions as pretext for terminating him. Snyder claims he is a qualified individual with a disability that substantially limits his major life activities and Boeing should have retained him in the Tool Crib job as a reasonable accommodation. He claims that failure to do so constitutes disability discrimination. This is the only accommodation identified by Snyder.

According to Snyder's testimony, however, he is not limited in any major life activities. Furthermore, the only evidence he has to show that Boeing violated the ADA is that he is no longer employed at Boeing. In addition, he has no evidence to show that the ARB or any member of management in the Tool Crib violated the ADA. The only person he believes violated the ADA was Dennis Malone when he moved Snyder into the Tool Crib job. Snyder admits he felt this was a violation of the ADA at the time it occurred. Snyder also admits that, while he listed his medical restrictions, he did not claim that they were inflated or misconstrued in his charge filed with the Equal Employment Opportunity Commission.

Snyder filed his charge with the EEOC on May 19, 1999. Because he forgot to have it notarized, he re-filed the charge on June 11, 1999. Snyder did not file the charge with the Kansas Human Rights Commission ("KHRC") and the KHRC has no record of him. Snyder was represented by counsel during the administrative process.

On or about March 31, 2000, the EEOC issued a right to sue notice, stating they could not establish any violations of the applicable statutes. On June 27, 2000, plaintiff filed a pro se complaint in the United States District Court for the District of Kansas. After retaining counsel, Snyder filed an amended complaint on September 22, 2000.

### 2. Conclusions of Law

The court finds Snyder's claims must be denied on the merits and for failure to timely exhaust administrative remedies.

 Under 42 U.S.C. § 2000e–5(c), federal charges may not be filed until 60 days after commencement of state or local proceedings, "unless such proceedings have been earlier terminated." In a "deferral state" state such as Kansas, in a case where the complainant has initially instituted proceedings with the appropriate state or local agency, the charge must be filed with the EEOC within an extend-

ed 300–day time period. The Supreme Court has written that a

> complainant in a deferral state having a fair employment practice agency over one year old need only file his charge within 240 days of the alleged discriminatory employment practice in order to insure that his federal rights will be preserved. If a complainant files later than that (but not more than 300 days after the practice complained of), his right to seek relief under Title VII will nonetheless be preserved if the State happens to complete its consideration of the charge prior to the end of the 300 day period.

*Mohasco Corporation v. Silver*, 447 U.S. 807, 814 n. 16, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980),

■ Here, Snyder was given his medical layoff by the ARB board on August 20, 1998. Two hundred and forty days after that date is April 17, 1999. Snyder filed his claim with the EEOC on May 19, 1999. Although represented by counsel, Snyder never filed any claim with the Kansas Human Rights Commission. Because Snyder never filed or attempted to file any claim with the KHRC, no proceedings before that body were ever commenced. *See Hughs v. Valley State Bank*, 26 Kan. App.2d 631, 994 P.2d 1079 (1999). Since plaintiff failed to ever file his charges with the relevant state agency, his claims are limited to those within the 240 days preceding his EEOC charge. Here, it is uncontroverted that no relevant events of alleged discrimination occurred within this period, either as to the claims of disability or age discrimination. Accordingly, plaintiff's claims on these grounds will be dismissed for failure to exhaust his administrative remedies.

■ However, even assuming the present action were timely filed, the plaintiff's claims would in any event be subject to dismissal on the merits. As to plaintiff's claim under the ADA, the plaintiff has failed to provide evidence that he is disabled within the meaning of the statute, that is, that he is substantially limited in performing a major life activity. *See* 42 U.S.C. § 12102(2)(A) In his deposition, Snyder was asked:

Q. What major life activity of yours is limited?

A. At Boeing?

Q. No. Just in general. Like, for instance, your ability to walk or to take care of yourself or to dress yourself or something like that.

A. Nothing.

Q. Nothing is limited?

A. No.

Q. So it's your testimony then that you are not substantially limited in any major life activities, is that correct?

A. I can do anything.

(Snyder dep. at 208). Plaintiff directly disavowed having any substantial limitation on major life activities, specifically including the ability to walk. He directly avers that he "can do anything."

■ Alternatively, even assuming Snyder were deemed "disabled" within the meaning of the ADA, the evidence fails to establish that he is a "qualified individual with a disability" under the statute. 42 U.S.C. § 12112(a). A qualified individual with a disability is a person who is disabled, but is able to perform the essential functions of the job, either with or without the reasonable accommodation by his employer.

Here, Snyder was restricted from walking more than 200 yards per 8–hour shift. Snyder never attempted to have his doctor remove these restrictions. When Boeing discovered that Snyder was walking more than this in his work (on or around July 8, 1998, after Snyder complained about not

receiving overtime work), it performed an ergonomic evaluation on his position. It found that Snyder was in fact walking 1700 yards per shift, that this was outside of his restrictions, and that there was no accommodation which would permit Snyder to perform the functions of his job within the medical restrictions. Neither at the time nor at any point subsequently has Snyder identified any reasonable accommodation which would have allowed him to perform the essential functions of his job within his medical restrictions. As a result, Snyder is not a qualified individual with a disability.

Similarly, Snyder's age discrimination claim—based upon his transfer from the job of Tool and Die Maker to the Tool Crib position—will also be dismissed since the uncontroverted evidence fails to establish a prima facie case of age discrimination. The uncontroverted evidence is that Snyder was happy in this position, and that the transfer had no effect on his rate of pay. There is no evidence that the transfer was an adverse employment action.

Further, as noted above, the evidence establishes that Snyder was transferred because he complained that the Tool and Die Maker job was outside his medical restrictions. The evidence establishes that Snyder subsequently could not perform the essential functions of the Tool Crib job either. There is no evidence that the transfer to the Tool Crib job was a pretext for unlawful discrimination.

Snyder complains that co-workers had referred to him as "Fast Eddy," "Sue Happy," and "Old Man." However, it is uncontroverted that the comments were made by Snyder's co-workers only. The comments were not made by any decision-maker, by any Boeing supervisor with involvement in Snyder's transfer to the Tool Crib position. Instead, as noted above, the transfer resulted from Snyder's own complaint about the nature of his ability to perform the Tool and Die Maker job.

IT IS ACCORDINGLY ORDERED this_____ day of September, 2001, that the defendant's Motion for Summary Judgment (Dkt. No. 34) is hereby granted.